Filed 8/11/21  In re K.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>K.M. et al.,<br><br>        Defendants and Appellants. | E076538<br><br>(Super.Ct.Nos. J274064, J274065)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant K.M.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant A.B.

1

Michelle D. Blakemore, County Counsel, and Pamela J. Walls, Special Counsel, for Plaintiff and Respondent.

K.M. (mother) and A.B. (father) appeal from an order terminating their parental rights to their son and daughter. They contend that the juvenile court erred by declining to find that the parental-benefit exception applied. (See § 366.26, subd. (c)(1)(B)(i).)[1]

We see a lot of cases raising the identical contention in which it would have been an abuse of discretion to find that the parental-benefit exception *did* apply. This is not such a case. On the facts here, the juvenile court could reasonably find that the parental-benefit exception did apply; however, it also could reasonably find that it did not. For a lower court, that presents a difficult decision — the kind that keeps trial judges awake at night. For us, by contrast, it presents a relatively easy decision. In this situation, under the deferential abuse of discretion standard of review, we must affirm.

I

STATEMENT OF THE CASE

This case involves two of the mother's children. In 2017, when it was filed, J.G. (J.), a boy, was six; he is now nine. K.B. (K.), a girl, was eight months old; she is now four.

The father is the biological father of K. There was conflicting evidence as to whether he was also the biological father of J. According to the mother, however, "he

---

[1] This and all further statutory citations are to the Welfare and Institutions Code, except as otherwise indicated.

holds both children out a[s] his own." The juvenile court found that he was the presumed father of both children.

In October 2017, during an argument, the father hit the mother in the face, leaving her with a broken nose, a chipped tooth, and a ruptured ear drum. According to the father, it was the mother who attacked him.

The mother said she would obtain a restraining order but did not. Instead, according to a relative, she let the father back in the home. The mother denied that the father was living with her, but she admitted that he was babysitting the children when she was at work. She reported that the father used methamphetamine, cocaine, and marijuana.

Accordingly, Children and Family Services (Agency) filed dependency petitions regarding the children. They were detained from the father but not from the mother, on condition that the father not live in the home.

After the detention hearing, J. revealed that the father had "never moved out . . . ." The Agency discovered that each parent had an extensive criminal history; the father's included eight prior arrests and/or convictions for domestic violence. In January 2018, the police were called to the home. The mother claimed the father broke in; he claimed he lived there. They each claimed the other had been violent. The father was arrested for violation of a protective order.

The Agency detained the children from the mother and placed them with the father's sister.

3

At the jurisdictional/dispositional hearing, in February 2018, the juvenile court sustained jurisdiction based on failure to protect. (§ 300, subd. (b).) It formally removed the children from the parents' custody and ordered reunification services.

In June 2018, the children were placed in a foster home. In or before August 2018, they were placed with a relative of the father. In December 2018, they were placed in a foster home again.

The father and the mother continued to be in a relationship and to engage in domestic violence. The father failed to comply with his reunification services plan. The mother completed hers, but she "failed to benefit from services."

At the 18-month review hearing, in September 2019, the juvenile court terminated reunification services; however, it did not set a section 366.26 hearing because the children had no prospect of adoption or a legal guardianship.

In November 2019, the children were placed with one of the mother's sisters (aunt). The aunt soon indicated that she wanted to adopt them. In June 2020, the juvenile court set a section 366.26 hearing.

In February 2021, at the section 366.26 hearing, the juvenile court found that the children were adoptable and that there was no applicable exception to termination of parental rights. It therefore terminated parental rights.

II

THE PARENTAL-BENEFIT EXCEPTION

The mother contends that that the parental-benefit exception applied as to her, and the juvenile court erred by finding otherwise. The father joins in this contention; he does not claim that the parental-benefit exception applied as to him, but he notes, correctly, that if the juvenile court erred by terminating the mother's parental rights, then it necessarily also erred by terminating his. (Cal. Rules of Court, rule 5.725(a)(1).)

A.      *Additional Factual Background.*

The evidence admitted at the section 366.26 hearing consisted of one social worker's report, plus the oral testimony of the mother, the father, J., and the social worker. We confine our consideration to this evidence (see § 366.26, subd. (b); Cal. Rules of Court, rule 5.725(d)), which showed the following.

At the time of the section 366.26 hearing, J. was nine and K. was three. They had been out of the mother's custody for more than three years. They had been placed with the aunt for over 14 months, since November 2019. This was their fourth placement.

The aunt was "dedicated" to the children. The social worker reported that "[b]oth children appear very comfortable [with] and appear to be quite attached to their caregiver . . . ." "Both K[.] and J[.] have appeared to be settling in and K[.] appears calmer and more content in placement with her aunt . . . ." The children had "assured" the social worker "through their verbal and non-verbal communications that they like living with [the aunt], that they sense her care for them and they wish to be adopted by her."

5

J. told the social worker "he loves [the aunt] like a mom." "I want to get adopted by her." When the social worker asked K. "if she liked living with her aunt, wished to stay and be adopted by her, she nodded her head furiously."

J. testified that his preference would be to stay with the aunt and still have visits with the mother. He had told the aunt, "As long as I see my mom, I'm okay with getting adopted." If he could not visit the mother anymore, he would be "[a] little sad . . . ."

The mother had supervised visitation for two hours, once a week, plus a phone call once or twice a week. Between October and Christmas 2020, the visits were usually at a park; thereafter, they were at the Agency's offices. The mother had missed only a handful of visits, all for reasons beyond her control, such as illness or a flat tire.

The mother and the children were "affectionate" with each other. K. would get excited and run to her. Both children would hug her and call her "Mom." J. would say, "I love [you]." However, K. also called the aunt "Mom." J. generally called the aunt "Auntie [first name]," although he had called her "Mom" in a letter once.

The mother and the children would talk, play games, and watch movies. At the end of visits, K. wanted the mother to come with her. J. was "okay" with the end of visits.

The children enjoyed the visits. J. testified that he looked forward to the visits and wished they lasted longer. The mother told him if he wanted to phone her, the aunt would let him, but he never did.

The mother asked the aunt for visitation during Christmas 2020. The aunt offered her a one-hour in-home visit on Christmas eve. The mother then refused to visit at all, "because my visits are normally two hours."

The aunt had asked to stop supervising the visits because "she didn't feel safe . . . . She had issues with Mom, so she indicated that she doesn't feel comfortable supervising the visits anymore." "Several times," the social worker had had to end a visit early because the mother would get upset and yell.

According to the social worker, the aunt was "open to continue a relationship with the family." "[S]he wants the kids to have contact with the parents." J. confirmed that the aunt had told him that she would still take him to see the mother. The mother did not believe this, because she and the aunt did not have a good relationship.

In the mother's opinion, both children had a "strong bond" with her. She believed adoption would be "harmful" to them because the aunt could not take her place as their mother.

B.    *Legal Background.*

"'[A]t a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child — adoption, guardianship or long-term foster care.' [Citation.] At this stage of the dependency proceedings, adoption is preferred because it ensures permanency and stability for the minors. [Citations.]" (*In re A.S.* (2018) 28 Cal.App.5th 131, 152.) Thus, as a general rule, at a section 366.26 hearing, if

7

the trial court finds that the child is adoptable, it must select adoption as the permanent plan and terminate parental rights. (§ 366.26, subds. (b)(1) & (c)(1).)

However, there are several exceptions to this rule. (§ 366.26, subds. (c)(1)(A)-(B), (c)(2).) One such exception applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

To establish the exception, a parent must prove three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631.)

To prove a beneficial relationship, "[a] parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child . . . . The relationship arises from day-to-day interaction, companionship and shared experiences.' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555, fn. omitted.)

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]" (*In re*

8

*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The court asks, "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.]" (*Id*. at p. 633.)

"[A] substantial evidence standard of review applies to the first two elements." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 639.) But "the ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion." (*Id.* at p. 640.) "A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'"" [Citation.]" (*Id*. at p. 641.)

"'[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on other grounds in *In re Caden C.*, *supra*, 11 Cal.5th at pp. 637, fn. 6, 638, fn. 7.)

The juvenile court errs if it considers "the prospective adoptive parents' willingness to allow the children to have continued contact with mother." (*In re C.B.* (2010) 190 Cal.App.4th 102, 128 accord, *In re E.T.* (2018) 31 Cal.App.5th 68, 78.) Here, there was some evidence, albeit disputed, that the aunt would allow the children to

9

continue to visit the mother. However, there is no indication that the juvenile court considered or relied on this evidence.

The juvenile court also errs if it considers "a parent's continued struggles with the issues that led to dependency," except as it relates to the "interaction between parent and child." (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 637-639.) Again, there is no indication that the juvenile court did so.

C. *Application to These Facts*.

The juvenile court's finding that the mother did not have the necessary beneficial relationship with the children is supported by substantial evidence. The children had been out of her custody for more than three years. Her visitation was supervised. Most recently, it took place at the Agency's offices. (See *In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523 [parental-benefit exception is hard to prove when visitation has been supervised], disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414.) When given the opportunity of an in-home visit with the children at Christmas 2020, she refused it, because she resented her sister reducing the visit from two hours to one, even though her refusal would hurt the children more than her sister. She had told J. he could phone her if he ever wanted to talk to her, but he never did.

The mother's interactions with the children during visits — talking, playing games, watching movies — could be those of a babysitter rather than a parent. She asked J. if she could help him with his homework, but he declined because he did it at day care and the aunt helped him with it. She was asked whether she ever "redirect[ed] them or

10

correct[ed] their behaviors"; she said once, when K. slapped her, she told her not to do that. She could not give any other examples. She had advised J. to be more "into . . . education" than "into girls," but he was "not listening" to her.

On redirect, the mother's attorney specifically asked her how her visits were those of a parent rather than "if you were just another relative or a friend . . . ?" She answered that she taught the children "educational stuff," but then she trailed off, "it's hard to explain . . . . I don't know how to explain it . . . ."

Moreover, the juvenile court's conclusion that termination of parental rights would not be detrimental was not arbitrary, capricious, or patently absurd. The children had settled in with the aunt and had become "quite attached" to her. When a visit ended, J. was "okay"; K. wanted the mother to come with her, but it does not appear that she was distressed when the mother did not. There was no evidence that either child suffered from missing the mother in between visits.

The strongest evidence in the mother's favor was J.'s testimony, "As long as I see my mom, I'm okay with getting adopted." If he could not visit the mother anymore, he would be "[a] little sad . . . ." He looked forward to visits and wished they could be longer. This testimony was undercut, however, by the fact that he had been told he could phone the mother whenever he wanted, but he had no done so. The juvenile court could reasonably find that J. would be, as he said, "[a] little sad"; however, this harm would be outweighed by the benefit of permanence with a loving and "dedicated" caregiver. And K. would not be harmed at all.

The mother's discussion of the evidence is unduly conclusory. For example, she says: "Both children identified mother as their true parent — she was not merely a 'friendly visitor." The portions of the record cited, however, show only that (1) J. and K. called the mother "Mom" or "Mommy"; (2) in the mother's opinion, both J. and K. saw her as their mother, although she had trouble explaining how she could tell; and (3) in the opinion of minors' counsel, J. "holds [the mother] out to be his mom and . . . holds [the aunt] out to be his aunt . . . ."

This conclusory approach obscures the possibility that the juvenile court could have drawn different conclusions from the evidence. The cited portions of the record also show that K. also called the aunt "Mommy"; K. sometimes called the mother by her first name; and J. had written a letter to the aunt calling her "Mom." In any event, the juvenile court specifically found that "[t]he title 'Mom' . . . is not enough . . . ." It did not have to accept the mother's poorly supported opinion, and it did not have to accept minors' counsel's representations as evidence at all.

The juvenile court had the benefit of observing J. and the mother, both individually and together. (Cf. *In re C.B.*, *supra*, 190 Cal.App.4th at p. 126 [juvenile court noted, "It was clear . . . , by the eye contact and the smiles, that the children were happy to be sitting in the same room as the parents."].)

We therefore conclude that the juvenile court made a tough call as best it could; the call that it made was supported by the evidence and consistent with the applicable law.

12

## III

## DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
_____
P. J.


We concur:

McKINSTER
_____
J.

RAPHAEL
_____
J.